UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SUSAN G.  GALLEGOS,

               Plaintiff,                Case No.  06-12643

v.                                    District Judge Avern Cohn
                                    Magistrate Judge R.  Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Susan G. Gallegos brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  I recommend that Defendant's Motion for Summary Judgment be granted and that Plaintiff's Motion for Summary Judgment be denied.

## <u>PROCEDURAL HISTORY</u>

On May 3, 2004, Plaintiff filed an application for Disability Insurance Benefits (DIB), alleging an onset date of January 1, 2003 (Tr. 62).  After the Social Security Administration (SSA) denied benefits on November 3, 2004, she made a timely request

for an administrative hearing held on November 8, 2005, in Lansing, Michigan (Tr. 12). Administrative Law Judge (ALJ) Eve Godfrey presided (Tr. 406). Plaintiff, represented by attorney Charles Robison, testified via video from San Diego, California (Tr. 12, 408-440). Vocational Expert ("VE") Gloria Lasoff also testified (Tr. 440-447). On December 30, 2005, ALJ Godfrey determined that Plaintiff was not disabled, retaining the ability to perform a limited range of unskilled work at the light exertional level (Tr. 22). On April 28, 2006, the Appeals Council denied review (Tr. 4). Plaintiff filed for judicial review of the final decision on June 15, 2006.

<u>**BACKGROUND FACTS**</u>

Plaintiff, born February 5, 1965, was age 40 when the ALJ issued her decision (Tr. 62). She completed 11th grade and worked as a certified nurse's aid in a nursing home and a private home from 1986 until 2002 (Tr. 71). After she stopped working as a certified nurse's aid, Plaintiff cleaned apartments for several months beginning in January 2003 (Tr. 421, 428-429).

### A. Plaintiff's Testimony

Plaintiff testified that she had been experiencing problems with carpal tunnel and tendinitis in her hands at the onset of her disability in January 2003 (Tr. 412). Plaintiff testified that she was fired after informing her employer that she could not use either of her hands (Tr. 412). She stated that afterwards she underwent surgery for the carpal tunnel (Tr. 412). Plaintiff reported also experiencing problems in January 2003 with sitting for long periods of time (Tr. 412-413). She stated that she underwent neck

surgery in February 2003 or 2004 and had a plate and six screws put into her neck (Tr. 412). Plaintiff testified that in June or July 2004 she started feeling constant pain that traveled from her lower to middle back and had problems walking far distances due to pains in her right leg (Tr. 413).

Plaintiff alleged that she suffered from chronic depression dating back to 1998 (Tr. 414). She reported seeking treatment for the depression once a week for the past two years from a community mental health organization (Tr. 414-415). She alleged that her depression caused her to become inactive and to remain at home (Tr. 417-418). She testified that her depression had decreased her social activities and physical contacts with people outside her home (Tr. 418). She testified that she experienced intense episodes of depression twice a week (Tr. 419). She also reported that she had difficulties concentrating (Tr. 419).

Plaintiff testified that she had received epidural injections in her back twice from hospitals to try to help with the back pain, but the injections did not relieve the pain (Tr. 415). She reported currently taking Hyzaar for high blood pressure, Acotose for her blood sugar, Wellbutrin for depression, Pumetanide for water retention, and Levisin for the stomach problems associated with a hernia (Tr. 415-417). Plaintiff reported also currently taking Trazodone to help her sleep and Cyclobenzaprine as a muscle relaxant (Tr. 416-417). She testified that she stopped using Wellbutrin for a period of time, but was put back on the medication at a stronger dosage (Tr. 435). Plaintiff denied having prior or present alcohol abuse problems (Tr. 432).

Plaintiff testified that she "[had] no ambition to do anything" (Tr. 421). She estimated having one to two good days a week where she was able to get out of bed and do something (Tr. 422). She reported doing nothing on her bad days (Tr. 422). She indicated that she prepared meals, but her husband bought carry-out food for most of the week's meals. (Tr. 422). She testified that when she was able to move, she did most of the household chores with help from her children (Tr. 422).

Plaintiff testified to having problems sleeping at night, due to right arm pain (Tr. 423). She reported having constant pain in her shoulders (Tr. 423). She testified that she experienced a lot of severe headaches in the back of her head, attributing the pains to the plate and screws in her neck (Tr. 423-24). She reported that the pains occurred four to five times a week and would sometimes become so intense as to prevent her from moving her head (Tr. 424). She testified that she tried to get relief from the headaches by lying down and taking Tylenol (Tr. 424).

Plaintiff testified that the worst pain was in her lower back, and rated it a "ten" on a scale of one to ten, adding that the neck pain fluctuated between a "three" and "ten" (Tr. 424-25). She testified that she needed to lie down twice a day for 30-45 minutes to cope with the pain (Tr. 425). She stated that x-rays revealed the existence of a spot on her lungs which the doctors examined every three months (Tr. 425). She testified that she had shortness of breath and used inhalers when needed (Tr. 425).

Plaintiff reported that she was unable to lift her right arm above her head, bend the right arm back, lift things with the right arm, or carry things with the right arm (Tr. 426).

She testified that she was unable to grip small or large objects with her right hand, and that she was unable to use her hands or arms for repetitive movement (Tr. 426). Plaintiff, right-handed, testified that she is able to use her left hand to lift and carry objects weighing up to 10 pounds (Tr. 426-427). Plaintiff reported that she was generally able to sit comfortably for five minutes at most unless she was "sitting in something really comfy," like her recliner, due to the lower back pain in her right side (Tr. 427). She testified that she was not able to stand for more than five minutes or walk long distances due to lower back pain (Tr. 427).

Plaintiff testified that when she shops for groceries she needs to lean on the shopping cart and feels pain when bending or stooping down (Tr. 428). She admitted that she transported her children to and from school, adding that she could drive no more than 10 minutes without experiencing discomfort (Tr. 428). She also testified that she was taking care of her four year old step-grandson (Tr. 430). She reported that she did not need to chase after her step-grandson when she took care of him at home as they remained in the same room together and that she enlisted her children's help to watch him if she took him out to a park (Tr. 438). Plaintiff testified that she had seen a therapist for a couple years, but stopped for a "big lapse in time" before resuming therapy again (Tr. 433). She then confirmed that she stopped attending therapy from July 2004 to March 2005 (Tr. 434). She testified that several of her therapy sessions were conducted with her children as a form of family counseling regarding issues that concerned her children and wanted to have marriage counseling, but her husband refused to attend with

her (Tr. 435-436).  She testified that she stopped seeing her therapist in October 2005 and had not had an opportunity to see her since (Tr.  436).

Plaintiff testified that she went to physical therapy, but reported that her doctor "hasn't had [her] go back" (Tr. 437).  She testified to undergoing an MRI, adding that her doctor had suggested getting a bone scan (Tr. 437).  In addition to carpal tunnel, Plaintiff has a hiatal hernia and is diabetic (Tr. 437).  She admitted that she had been advised to quit smoking and lose weight, but testified that she was unable to lose weight despite eating very little due to pains in her stomach (Tr. 437-439).  She reported that she did the home exercises that the physical therapist gave her, but did not consider them effective for weight loss (Tr. 439).  She testified that her ability to remain physically active was compromised due to her back pain (Tr. 439).  She reported that despite undergoing carpal tunnel surgery, she still occasionally experienced hand pain (Tr. 440).

### B.  Medical Evidence

### i. Treating Sources

In January 2002, Plaintiff received injections and a prescription for pain medication after reporting pain and swelling in her right wrist (Tr. 357-363).  Plaintiff reported worsening pain along with new pains in her left wrist (Tr. 350-361).  In January 2003, John J. Wald, M.D., diagnosed Plaintiff with "relatively mild" carpal tunnel syndrome in both wrists after conducting an electrodiagnostic evaluation of the upper extremities, determining that she might need to reconsider surgery if she did not note an improvement in the pain after using Neurontin (Tr. 123).  Harish Rawal, M.D., performed

right carpal tunnel decompression on March 27, 2003, observing that Plaintiff was "coming along very well" when he removed her sutures the next month (Tr. 164-166, 189-90). Dr. Rawal performed left carpal tunnel decompression on May 1, 2003, noting that Plaintiff was "doing very well" when he removed her sutures and that she was discharged from his care with "excellent results" (Tr. 161-163, 188-89).

In January 2004, Plaintiff was administered emergency room treatment by Lorna Otis-Pepper, NP, who determined that she had "musculoskeletal pain, left arm, left shoulder and cervical pain" (Tr.154). Chest x-ray showed "nothing acute" (Tr. 156). Plaintiff experienced headaches and "generalized aches all over, positional, neck and left pain" in December 2003 (Tr. 155). She was seen by Sandra R. Richards, M.S.N., in January 2004, a nurse practitioner working in the office of Bruce Bigelow, M.D. Richards observed stiffness in the upper part of the trapezius and increased discomfort with movement of the neck forward and shoulder (Tr. 127). She also noted there was "equal hand grasp, but some swelling" (Tr. 127). Plaintiff reported that she had been regularly lifting and carrying her grandchild (Tr. 127). Examination of the cervical spine revealed "a mild degree of degenerative disc narrowing in the lower cervical spine at C5-6 and C6-7 levels, but "no acute abnormality" of the cervical spine (Tr. 152).

When Plaintiff returned several weeks later in January 2004, Richards reported that Plaintiff continued to have discomfort in her neck, but more so in her lower back if she happened to sit for "very long periods of time" (Tr. 126). Plaintiff reported feeling more pain after attending physical therapy sessions (Tr. 126). Richards observed that

elevation of the left leg seemed to increase Plaintiff's neck pain and that there was "some pain of the shoulders with elevation of the shoulders" (Tr. 126). Richards also noted that a "[r]ecent C-spine indicated hypertrophy of the AC joint on the left and also some mild degeneration at C5-6, C6-7" (Tr. 126). Richards observed a congested cough (Tr. 126). An MRI taken of Plaintiff's spine indicated a "mild degenerative cervical spondylosis" (Tr.130).

Imaging scans from February 2004, showed Plaintiff had "moderate to marked degenerative hypertrophy" of the left L5-S1 facet joint, considered a "chronic finding" (Tr. 140). Plaintiff also had "additional minor degenerative changes" to the lumber spine at multiple levels, "no evidence of substantial or high grade lumbar disc narrowing," and "very minimal degenerative changes at the sacroiliac joints and hip joints." (Tr. 140). Plaintiff was admitted to Foote Hospital shortly after, undergoing a cervical diskectomy, fusion, and instrumentation extending from C5 through C7 (Tr.133). Dr. Rawal inserted a Caspal plate and screws in Plaintiff's neck (Tr. 135). Dr. Rawal's final diagnosis was a cervical disk herniation at C5-6 and C6-7 (Tr. 133). In April 2004, Plaintiff's imaging scans status post disc herniation noted there was "prevertebral soft tissue swelling that [extended] from C3-C7" and that the rest of the examination was "unremarkable" (Tr. 132).

In May 2004, Plaintiff sought treatment from Dr. Rawal, complaining of "intrascapular discomfort" and "pain in the mid and lower back" (Tr. 184). Dr. Rawal noted that movement of the neck was unrestricted and offered Plaintiff muscle relaxers to

help with the pain (Tr. 184). Plaintiff continued to complain of lower back pain and intrascapular pain, but admitted feeling improvement in her neck (Tr. 184). Dr. Rawal attributed the lower back pain to degeneration (Tr. 184). Dr. Rawal performed a lumbar epidural steroid block on Plaintiff in June 2004 (Tr. 184). A month after the procedure, Plaintiff continued to complain of back pain, although Dr. Rawal noted that her neck was "coming along well" and "strength in the individual group of muscles [was] within normal limits" (Tr. 131, 184). In July 2004, after examining Plaintiff again, Dr. Rawal noted that an MRI scan of her back "did not show any evidence of any abnormality" (Tr. 183). He opined that there was "nothing surgically that [he] could offer to her," suggesting that she talk to Dr. Bigelow, her primary care physician, about a referral to a physiatrist (Tr. 183).

Plaintiff saw social worker Cheryl O. LeBeau, A.C.S.W., for therapy from December 2003, to February 2004 (Tr. 169). LeBeau noted that Plaintiff reported feelings of depression, nervousness, insomnia and irritability, as well as problems with her children (Tr. 177-78). LeBeau reported that Plaintiff had lost eight family members in the previous five years (Tr. 178). Of Plaintiff's eight sessions with LeBeau, three sessions were spent with Plaintiff's two children for family counseling and improving her parenting skills (Tr. 170-178). LeBeau observed that Plaintiff suffered from verbal abuse from her husband and felt that her husband had "beat her down," resulting in Plaintiff's lack of self-worth and desire to care for herself (Tr. 172-73). LeBeau noted Plaintiff made "good" progress and was "engaged" during the sessions (Tr. 170-174).

In September 2004, Adam B. Agranoff, M.D., observed that Plaintiff was a "moderately obese woman in no apparent distress" and that the etiology of her low back and bilateral extremity symptoms were "unclear" (Tr. 242-43). During the physical examination, Dr. Agranoff observed that "[s]traight leg testing in the seated and supine positions do not reproduce back pain or leg symptoms" (Tr. 243). Dr. Agranoff reported that there was "some degeneration of the bilateral lumbar facets at L4-5 and L5-S1. There [were] no disc herniations. There [was] no spondyloisthesis or spondylysis" (Tr. 243). Plaintiff reported that taking Bextra and Vicodin were helpful for her back pains and that her symptoms were relieved with rest (Tr. 242). Dr. Agranoff referred Plaintiff to a course of physical therapy with a spine specialist, where treatment would focus on "lumbopelvic stablization, body mechanics instruction, and instruction in a home exercise program" (Tr. 243).

During a physical examination in December 2004, Dr. Agranoff noted that Plaintiff experienced tenderness of the right upper trapezius and that her "cervical range of motion is limited with lateral rotation to the right, and side bending to the left, both of which reproduce right-sided upper back and neck pain" (Tr. 239). Plaintiff received trigger point injections to the right upper trapezius (Tr. 239). Dr. Agranoff's treatment notes stated that "[o]verall, she [was] doing reasonably well," but that Plaintiff reported increased upper back and neck pain that tended to be worse on her right side and radiated some into the proximal right arm (Tr. 239). Dr. Agranoff observed that "[m]anual muscle testing of the bilateral and upper and lower extremities [was] grossly within normal

limits. Lumbar flexion and extension [were] only minimally limited, but [were] painful at end range" and straight leg testing was negative bilaterally (Tr. 239). Plaintiff received a lumbar epidural steroid injection on January 2005, but reported that she only felt the benefits of the injection for about a week (Tr. 238-239).

Plaintiff returned to therapy with LeBeau from March 2005 to May 2005 (Tr. 244-252). LeBeau noted in their initial meeting in March 2005, that Plaintiff's depression and marital issues had "worsened," but that she seemed to improve a few weeks later as she looked "less disheveled" and had said she "[felt] she [was] doing better with her mood" (Tr. 248-252). Plaintiff's response to therapy was noted to be "open" or "engaged," and her progress was observed to move from "depressed" to "good," "open," and "consistent" over the course of the sessions (Tr. 244-252).

LeBeau conducted a Mental RFC assessment in June 2005, characterizing Plaintiff as having "fair" ability in unskilled work to remember work-like procedures; understand and remember very short and simple instructions; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; respond appropriately to changes in a routine work setting; deal with normal work stress; and accept instructions and respond appropriately to criticism from supervisors (Tr. 256). In assessing Plaintiff's capacity for unskilled work, LeBeau characterized her ability to maintain attention for two hour segments and perform at a consistent pace without an

unreasonable number and length of rest periods as "poor or none"(Tr. 256). Plaintiff was characterized as having "fair" ability in semiskilled and skilled work to understand and remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled work; interact appropriately with the general public; maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness; and use public transportation (Tr. 257-258). LeBeau noted that "[a]ll physical [symptoms] have exacerbated depression" (Tr. 258).

LeBeau also completed a Psychiatric Review Technique Form, assessing Plaintiff's status from March to June 2005 (Tr. 259). LeBeau diagnosed Plaintiff with "Major Depressive Disorder, recurrent," with such symptoms as anhedonia, appetite disturbance with change in weight, sleep disturbance, decreased energy, and difficulty concentrating or thinking (Tr. 262). Plaintiff was characterized as having "marked" restriction of activities of daily living and difficulties in maintaining concentration, persistence or pace (Tr. 270). LeBeau opined that Plaintiff's "depression and pain would impact stress of work" (Tr. 257). Plaintiff visited LeBeau once more in July 2005, and stopped attending therapy after Plaintiff cancelled three appointments (Tr. 384-385).

Nurse Practitioner Richards reported in January 2005, that Plaintiff's cholesterol and insulin levels were rising, strongly urging Plaintiff to exercise regularly, lose weight, quit smoking and adjust her diet in response to her obesity (Tr. 281, 290-295). Plaintiff underwent a CT scan of her chest in February 2005, revealing a "5 to 6 mm oval subpleural noncalcified concavitating pulmonary nodule in the right lower lobe" of her

lung (Tr. 286, 290). In March 2005, Richards also noted that Plaintiff was suffering from some anxiety and depression, and placed Plaintiff back on Wellbutrin for her depression and Desryel to help her sleep (Tr. 283). Richards observed that Plaintiff's only exercise was helping her daughter distribute papers (Tr. 281). Another CT scan of Plaintiff's chest in May 2005, revealed that there was "mild fibrotic interstitial density in both lungs" and a "5-6 mm focal irregular nodular density in the posterior lateral right lung in the right lower lobe" corresponding to the nodular density seen in the previous CT scan (Tr. 275). The radiologist determined that it was most likely a small fibrotic nodule and had not changed significantly since the last exam (Tr. 275). A chest x-ray taken the same day as the MRI showed "evidence of mild chronic bronchitis" (Tr. 276). After Plaintiff complained of problems with reflux, she underwent an esophagogastroduodenoscopy ("EGD") in July 2005, and was diagnosed afterwards with a large hiatal hernia (Tr. 369).

A Medical Source Statement Concerning Claimant's Ability to Engage in Work Related Activities ("Medical Source Statement") signed by Richards in July 2005, diagnosed Plaintiff with "mild/mod. degenerative disc disease" (Tr. 372). Richards stated that depression and anxiety contributed to Plaintiff's physical condition, noting "chronic pain leading to depression" (Tr. 372). She stated that Plaintiff's experience of pain or other symptoms would "often (50%)" interfere with attention and concentration, and that Plaintiff had a "moderate limitation (50%)" in her ability to deal with work stress (Tr. 373). With regard to Plaintiff's physical ability, Richards deemed her able to walk less than one block without rest or severe pain, sit continuously for 20-30 minutes "if

comfortable and supported" and stand continuously for 10-15 minutes (Tr. 373). She found Plaintiff able to stand/walk less than two hours and sit for about two hours total in an eight hour working day, needing breaks "frequently" during the working day (Tr. 374). Plaintiff could carry less than 10 pounds "frequently" and 10 pounds "occasionally," with "significant limitations" in doing repetitive reaching, handling, and fingering (Tr. 374). Plaintiff was deemed "unable" to use her right hand to grasp, turn or twist objects or to use her right arm to reach overhead (Tr. 374).[1]

In July 2005, Plaintiff received a bilateral joint intraarticular steroid injection, reporting a few weeks later that her leg symptoms had improved "significantly" (Tr. 380, 383). However, she continued to have back pain, as well as neck pain radiating into her right arm and certain fingers (Tr. 380-81). Plaintiff also discontinued her use of Vicodin, reporting minimal results (Tr. 380). Examination notes described mild restrictions in her cervical range of motion, but without pain (Tr. 380). In August 2005, NCV Findings revealed "right median midpalmar mixed nerve latency" that was "borderline prolonged compared to the ulnar latency on the ipsilataeral side" and EMG Findings were "normal" when selected muscles representing the C5 through T1 myotomes underwent a needle examination (Tr. 376). Dr. Agranoff also noted electrophysiologic evidence of mild carpal tunnel syndome in the right wrist (Tr. 376).

---

[1]Richards' Medical Source Statement was later initialed by Dr. Bigelow, and re-submitted to the Appeals Council after the ALJ's decision (Tr. 386-389).

### ii. Consultive and Non-examining Sources

In September 2004, Thomas M. Horner, M.D., conducted a mental examination of Plaintiff for the Social Security Administration, concluding that Plaintiff had "Major Depressive Disorder, recurrent ... w/ Associated Alcohol Abuse and Dependence" and a GAF of 50-55[2] (Tr. 200). Plaintiff reported that she used the internet to play games and occasionally spent an entire day on the computer (Tr. 195). Several weeks later, Zahra Khademian, M.D., a DDS physician, completed a Psychiatric Review Technique Form and determined that "[a] medically determinable impairment is present that does not precisely satisfy the diagnostic criteria," namely "major depression" and "ETOH abuse/dependence" (Tr. 206, 211). The report also concluded that Plaintiff had "moderate" difficulties in maintaining concentration, persistence, or pace and that the evidence did not meet the "B" criteria or establish the presence of "C" criteria of a 12.04 disorder (Tr. 213-14). Dr. Khademian also completed a Mental RFC report and determined that Plaintiff had a "moderately limited" ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances (Tr.

------------

[2]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school function. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders –Text Revision* at 34 (*DSM-IV-TR*), 30 (4th ed.2000).

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders –Text Revision*, 34 (*DSM-IV-TR*) (4th ed.2000).

217).  In addition, the Mental RFC report found that Plaintiff had a "moderately limited" ability to accept instructions and respond appropriately to criticism from supervisors (Tr. 218).  Dr. Khademian noted that Plaintiff seemed "capable of doing simple tasks on a regular basis at this point," basing her conclusion on the evidence in the file (Tr. 219).

In October 2004, Bharti Sachdev, M.D., performed an examination for DDS, deeming Plaintiff's range of motion "almost normal" with regard to the herniated disc, and noting that she had "some aching pain in the back and right side of the neck" which he thought was "related to residual pain of her surgery and may stay there" (Tr. 223).  Dr. Sachdev, noting a history of depression, observed that Plaintiff looked "depressed and tearful" (Tr. 223-224).  Plaintiff reported no chest pain or shortness of breath (Tr. 222).  A physician conducting a physical RFC assessment concluded that Plaintiff could "occasionally" lift and/or carry 20 pounds, "frequently" lift and/or carry 10 pounds, stand and/or walk (with normal breaks) a total of about 6 hours in an 8-hour workday, sit (with normal breaks) a total of about 6 hours in an 8-hour workday, and had unlimited ability to push and/or pull.  (Tr. 227).  The RFC assessment found that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl; and a complete absence of manipulative, visual communicative or environmental limitations (Tr. 22-230).  It stated that Plaintiff could do "[activities of daily life] slowly with breaks" (Tr. 231).

### C.    Vocational Expert Testimony

VE Gloria Lasoff classified Plaintiff's past relevant work as a nurse's aid and housecleaner as semi-skilled at the medium exertional level (Tr. 441).

The ALJ then posed the following question to the VE:

"If an individual could walk less than one block, could sit for 30 minutes at a time, could stand for 15 minutes at a time but could stand and walk less than two hours in an eight-hours workday and about – sit about two hours in an eight-hour workday that would not constitute full-time employment. And so I assume that there would be no full-time jobs for individual...Just looking at manipulative limitations if an individual – a right-hand dominant individual was unable to twist, turn or grasp with the right hand and with the right could – I'm not sure I'm reading this right, do fine manipulation ten percent of the time but with the left hand could do continuous manipulation and could not reach overhead with the right...With respect to mental issues if an individual's ability to remember work-like procedures was fair but could understand and remember very short and simple instructions well and carry those out, who could not maintain attention for two-hour segments, who had a fair ability to maintain regular attendance and be punctual within customary usually strict tolerances, and had a fair ability to sustain an ordinary routine without special supervision...A good ability to work in coordination with or proximity to others without being unusually distracted. A fair ability to make simple work-related decisions. A fair ability to complete a normal workweek and workday without interruption from psychologically based symptoms. No ability to perform at a consistent pace without an unreasonable number and length of rest periods. A good ability to ask simple questions or

request assistance. And a fair ability to accept instructions and respond appropriately from criticism from supervisors. A good ability to get along with others. A fair ability to respond appropriately to normal work stress. And a good ability to be aware of normal hazards and take appropriate precautions...without an unreasonable number and length of rest periods...if an individual could do sedentary work with a sit, stand option and the tasks were simple tasks with no overhead of the right arm would there be jobs for such an individual?"

(Tr. 441-444). The VE found that such an individual would be not be able to perform her past relevant work (Tr. 444). The VE stated that the Plaintiff would not be able to find any jobs at the sedentary level with a sit, stand option and without overhead use of the right arm, but would be able to perform work at the *light* level with a sit, stand option and without overhead use of the right arm (Tr. 444). The VE found that the Plaintiff could still perform a number of jobs in the national economy, such as production assembler (approximately 500 jobs in the Lansing and East Lansing area and 400,000 nationally), fabricator (approximately 200 jobs in the Lansing and East Lansing area and 300,000 nationally), and production inspector (approximately 250 in the Lansing and East Lansing area and 140,000 nationally) (Tr. 445). The VE confirmed that her testimony was based upon and consistent with the Dictionary of Occupational Titles (Tr. 447).

### D. The ALJ's Decision

ALJ Godfrey found that the Plaintiff's "status post diskectomy, decompression and

fusion at C5-7; degenerative joint disease of the lumbar spine; right shoulder impingement; and major depressive disorder" were severe impairments, but did not meet or medically equal any listing in Appendix 1 Subpart P, Regulations No. 4 (Tr. 14-16). In addition, ALJ Godfrey found that the Plaintiff's obesity, bilateral carpal tunnel syndrome, and lung nodule were not severe impairments (Tr. 14-15). While ALJ Godfrey noted that the medical source statements provided by Plaintiff's therapist supported the Plaintiff's claim that her depressive disorder met Listing 12.04, the ALJ also noted that Plaintiff's therapist was not a licensed psychologist and was not an acceptable medical source as defined at 20 CFR § 404.1513 (Tr. 15).

The ALJ found that Plaintiff was unable to perform her past relevant work as either a nurse's aid or housecleaner (Tr. 19). However, the ALJ determined that Plaintiff retained the physical residual functional capacity to "lift/carry 10 pounds frequently, lift/carry 20 pounds occasionally, stand/walk six hours per eight-hour day with a sit-stand option, sit six hours per day, perform no overhead reaching with her right upper extremity, and perform simple repetitive tasks" (Tr. 21). The ALJ adopted the VE's job findings and concluded that while Plaintiff could not perform the full range of light work, there were a significant number of jobs Plaintiff could still perform, such as assembler, (500 jobs), fabricator (200 jobs), and inspector (250 jobs) (Tr. 20, 22).

The ALJ deemed Plaintiff's alleged level of limitations "not totally credible," basing her conclusion on the analyses of the claimant's nonsevere impairments and the opinions of Plaintiff's therapist and nurse practitioner (Tr. 18). The ALJ also noted

Plaintiff did not demonstrate pain or discomfort while testifying at the hearing and had made a statement to her doctor a year prior to the hearing that her leg symptoms were "significantly improved" (Tr. 19). Finally, the ALJ found Plaintiff's reported household activities to be inconsistent with her claim of inability to perform any work (Tr. 19).

## STANDARD FOR REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherill v. Secretary of Health and Human Services*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

# FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984).

## ANALYSIS

### A.     Non-severe Impairments

Plaintiff argues that the ALJ erred by failing to take her non-severe impairments of obesity, carpal tunnel syndrome, and peripheral fibrosis into account in determining Plaintiff's RFC. Citing SSR 96-8p, she argues that an adjudicator must consider both severe and non-severe impairments in an RFC analysis (Pl. Br. 14).

An RFC is an "'assessment of a [claimant's] capacity for work' once his limitations have been considered." *Yang v. Comm'r of Soc. Sec.*, 2004 WL 1765480, *5 (E.D. Mich. 2004). It is not an evaluation of what a claimant "does and does not suffer from," but what the claimant "can and cannot do." *Webb v. Comm'r of Social Sec.*, 368 F.3d 629, 632 (6th Cir. 2004). While a claimant's "maladies should inform an assessment of her abilities, this does not mean that the RFC must enumerate them." *Howard v. Comm'r of Soc. Sec.* 276 F.3d 235, 239 (6th Cir. 2002). According to SSR 96-8p, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." 1996 WL 374184, *7 (S.S.A.). SSR 96-8p further states that an ALJ must consider the limitations and restrictions imposed by all of an individual's severe and non-severe impairments in combination. 1996 WL 374184, *5 (S.S.A.).

Contrary to Plaintiff's contention, the record shows that the ALJ reviewed both her severe and non-severe impairments. Plaintiff bases her argument on the lack of discussion of the combination of effects of her non-severe impairments on her severe impairments in the RFC assessment. Although Plaintiff places great significance on the absence of such a discussion, an ALJ does not necessarily "[fail] to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments'" and presents individual discussions of multiple impairments. *Loy v. Sec'y of H.H.S.*, 901 F.2d 1306, 1310 (6th Cir. 1990) (*citing Gooch v. Sec'y of H.H.S.*, 833 F.2d

589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S.Ct. 1050, 98 L.Ed.2d 1012 (1988)).  Likewise, an ALJ will have conducted "sufficient analyses of each of the claimants' impairments after carefully considering the entire record."  *Ridge v. Barnhart*, 232 F.Supp.2d 775, 789 (N.D. Ohio 2002).

The ALJ performed an extensive individual review of each of the impairments and noted her consideration of all impairments in reaching an RFC.  First, the ALJ referenced medical evidence from the record to support each of her five-step sequential findings, and also whether it supported the alleged limitations.  Second, the ALJ clearly stated that she "considered all symptoms" and "all of the claimant's medically determinable impairments in determining the claimant's residual functional capacity," adding that the finding was based on the "totality of the evidence."  The ALJ then pointed to lack of medical or laboratory evidence as grounds for disregarding certain of plaintiff's claimed limitations.  Third, the ALJ provided a step by step analysis of how she determined each restriction in the RFC and what evidence from the record she used in reaching each conclusion.  While the ALJ did not explicitly discuss the combination of Plaintiff's severe and non-severe impairments in the RFC assessment, she did state that she had also considered the nurse practitioner's list of limitations from the Medical Source Statement that were related to Plaintiff's non-severe impairments, including "[performing] minimal fine manipulations with her right hand," "[walking] less than a block," and "[standing] 10 to 15 minutes at a time and for less than two hours total per day" before giving her reasons for discounting these limitations.  Thus, Plaintiff's claim that the non-severe impairments were not

considered in combination with the severe impairments in the RFC fails.

**B.      Treating Sources**

Plaintiff also maintains that the ALJ impermissibly discounted three treating sources.  Citing the nurse practitioner's findings, Plaintiff claims that Social Security Ruling 06-03p permits evidence from "other sources" in or related to the medical profession to show the severity of her impairment and how it affects her ability to function (Pl. Br. 16).  She contends that the ALJ's failure to accord controlling weight to her treating sources mandates remand.

Under 20 C.F.R. §§ 404.1527(a) and 416.927(a)(2), only "acceptable medical sources" can provide medical opinions.  An acceptable medical source has been defined to include physicians, psychologist, optometrists, podiatrists, and speech pathologists.  20 C.F.R. §§ 404.1513(a) and 416.913(a).  A physician will be considered a treating source if "the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)(*quoting* 20 C.F.R. § 404.1502). Treating source opinions are entitled to controlling weight unless it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record." *Id.* at 877 (*quoting* 20 C.F.R. § 404.1527(d)(2)).  An ALJ must provide "good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Id.* at 875.  According to the court in *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th

Cir. 2004):

> "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors -- namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion."

### i. Physical Impairments Treating Source

Opinions from non-physician "other" medical sources such as nurse practitioners, physician assistants, and licensed clinical social workers are not technically "acceptable medical sources." Nonetheless, these opinions "should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-03P, 2006 WL 2329939 (S.S.A.)   Further, the Ninth Circuit has held that a source that is not a technically "acceptable medical source" may offer an opinion that is considered an acceptable source if the source is so closely related as to act as an agent for the acceptable medical source.   *Horton v. Apfel*, 185 F.3d 867 (9th Cir. 1999) *(*where a social worker working so closely under the supervision of and in consultation with a physician during the course of treatment as to be considered his "agent" was considered an acceptable medical source).   *See also Lacroix v. Barnhart*, 465 F.3d 881, 886 (8th Cir. 2006)(where opinions from "other" sources may be given treating source weight if the source worked on a treatment team where an acceptable medical source participated in the team's treatment of a claimant); *Shontos v. Barnhart*, 328 F.3d 418, 426-27 (8th Cir. 2003) (where a Medical Source Statement completed by a psychologist participating in a

treatment team consisting of "other" medical sources elevated the "other" medical sources to acceptable medical sources).

Plaintiff correctly argues that Richards should be considered an acceptable medical source as a nurse practitioner working under the supervision of Dr. Bigelow. Imaging scans and laboratory results were sent to both Dr. Bigelow and Richards at the same clinic, suggesting that Richards was associated with Dr. Bigelow's practice at the clinic. In addition, Plaintiff's surgeon and physiatrist addressed their letters to Dr. Bigelow, rather than Richards, indicating that he was overseeing Plaintiff's treatment program. Thus, the ALJ erroneously concluded that Richards was not an acceptable medical source.

However, regardless of whether Richards can be considered an acceptable medical source, the ALJ was correct in not according her controlling weight due to the inconsistencies between her opinion and the record. Her Medical Source Statement reported that Plaintiff was suffering from pain in her lumbar spine and lower back. However, Dr. Agranoff administered the straight leg test twice to the Plaintiff, which came back negative in both instances and did not demonstrate back or leg pain. Richards also diagnosed Plaintiff with a cervical diskectomy, but Dr. Rawal's notes reported that Plaintiff's neck was coming along well after surgery and there were no abnormalities. In addition, Dr. Agranoff reported only mild limitations in her cervical range of motion, but no pain. Dr. Sachdev reported in his consulting examination report that Plaintiff's neck had a "fairly normal range of motion." Richards also provided no clinical findings or objective signs in the space given in the Medical Source Statement or in Plaintiff's

treatment notes to support her opinions.  For these "good reasons," the ALJ did not give Richards' opinion controlling weight.

More generally, I disagree with Plaintiff's contention that Dr. Bigelow's opinion should be given controlling weight.  Although Dr. Bigelow was Plaintiff's treating source, his opinion was contradicted by substantial evidence from Plaintiff's other doctors.  As his opinion is identical to Richards' opinion, the same issues arise out of the inconsistencies between his opinion and the medical evidence from other doctors on the record.  The same analysis and conclusion applies here as it did above.[3]

### ii.  Mental Impairment Treating Source

I also disagree with plaintiff's argument that the ALJ impermissibly discounted

---

[3]Plaintiff contends that the Medical Source Statement submitted with Dr. Bigelow's initials after the ALJ's decision and before the Appeals Council decision should be taken into consideration by this court.  She argues that the doctor's opinion was evidence that he shared the nurse practitioner's opinion and should be considered as a separate opinion as well.  Under *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993)(*quoting Wyatt v. Secretary*, 974 F.2d 680, 685 (6th Cir. 1992)), "[w]here a party presents new evidence on appeal, this court can remand for further consideration of the evidence only where the party seeking remand shows that the new evidence is material." There must also be good cause shown for failing to incorporate the new evidence in the prior proceedings.  42 U.S.C. § 405(g).  The district court may not consider the new evidence in deciding whether to "uphold, modify, or reverse the ALJ's decision." *Cotton*, 2 F.3d at 695-96.

The initialed Medical Source Statement does not meet the *Cotton* standard for a Sentence Six Remand.  It was well-documented that Richards was working closely under Dr. Bigelow's supervision.  Although the court cannot consider this subsequent opinion submitted after the ALJ's decision, it does provide further confirmation that Richards was acting as Dr. Bigelow's agent.  In addition, as Dr. Bigelow's opinion was identical to Richards' opinion, the same problems concerning controlling weight would have arisen.

LeBeau's opinion. As a social worker, LeBeau was Plaintiff's primary treating source for her depression. To begin, the ALJ was correct in not awarding complete deference to LeBeau as an acceptable medical source. There was no evidence that she was closely associated with or working under the supervision of an acceptable medical source during her treatment of Plaintiff. As such, her opinion should not be accepted as being from an acceptable medical source that would be given controlling weight over Dr. Horner's opinion.

In addition, other portions of the record conflict with LeBeau's opinion. For example, LeBeau reported that Plaintiff's ability to maintain attention for 2 hour segments was "poor or none." This stands in contrast to Plaintiff's admission that she occasionally played games on the computer all day (Tr. 195). Furthermore, Dr. Horner characterized Plaintiff as having "focused and sustained" attention/concentration and no distractability issues during his examination. More significantly, LeBeau's own treatment records stand at odds with her disability finding. LeBeau found that Plaintiff possessed a "Fair" ability in most of the mental abilities to do unskilled or skilled work, where a "Fair" rating denoted a seriously limited ability to function, but did not preclude functioning. LeBeau's treatment notes also reported Plaintiff consistently making "good" progress over the course of her treatment.

Moreover, LeBeau's failure to provide any clinical or laboratory evidence in her treatment notes or forms, even after such material was requested, further undermines her findings. Her treatment notes revealed little about how she arrived at Plaintiff's clinical

diagnosis and it appeared that LeBeau relied on her general observations and Plaintiff's own accounts in determining the depression diagnosis. In contrast, Dr. Horner's opinion documented the clinical techniques that he utilized in his examination in assessing Plaintiff's mental condition.

## C.    Mental Disorder

Finally, Plaintiff claims that the ALJ erred by mischaracterizing Plaintiff's ability to perform the mental requirements of simple work. She argues that the ALJ utilized the wrong standard for determining what constituted a "substantial" loss of various mental abilities based on the Mental RFC descriptives.

This argument is an extension of the argument in the previous section. The Mental RFC signed by LeBeau is not entitled to controlling weight or deference. We have already discussed the reasons for relying more heavily on the other physicians' opinions in the above analysis. For the reasons already discussed, the ALJ properly relied on other medical opinions in finding non-disability.

## <u>CONCLUSION</u>

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1 (d)(2). Failure to file specific objections constitutes a waiver of any further right to

appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct.46, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local* 231, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1 (d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response should not be more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R.  Steven Whalen
R.  STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  July 11, 2007


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 11, 2007.


S/Gina Wilson
Judicial Assistant